**INTERNAL REVENUE SERVICE, Petitioner,**

**v.**

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**National Treasury Employees Union, Intervenor.**

**No. 91–1247.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 1992.

Decided May 5, 1992.

As Amended May 5, 1992.

Robert D. Kamenshine, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and William Kanter, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for petitioner.

James F. Blandford, Attorney, F.L.R.A., for respondent. William E. Persina, Sol., William R. Tobey, Deputy Sol., and Ira E. Hoffman, Attorney, Washington, D.C., were on the brief, for respondent.

Clinton Wolcott, with whom Gregory O'Duden and Barbara A. Atkin, Washington, D.C., were on the brief, for intervenor.

Before: EDWARDS, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case presents for review a decision rendered by the Federal Labor Relations Authority ("Authority" or "FLRA") pursuant to the Federal Service Labor–Management Relations Statute, 5 U.S.C. §§ 7101–7135 (1988) ("FSLMRS" or "Statute"). The dispute in this case arose when the Internal Revenue Service ("IRS") refused to recog-

nize a steward designated by the union representing certain of its employees. The union filed an unfair labor practice charge, alleging that the agency had interfered with its statutory right to choose its own bargaining representatives; the IRS defended on the ground that the individual designated by the union was precluded by the terms of the parties' collective bargaining agreement from serving as a steward.

Neither the parties nor the FLRA doubts that the union and the agency may lawfully agree to limit the class of individuals eligible to be designated as stewards, as was purportedly done here. The FLRA also acknowledged that the agency's refusal to recognize the designated individual was based on an interpretation of the parties' contract that was at least arguably correct. However, without ever deciding whether the contract *actually* justified the agency's action, the Authority held against the agency because the union had not "clearly and unmistakably waived" its statutory right to choose its bargaining representatives. *Internal Revenue Serv., Wash., D.C.*, 39 F.L.R.A. 1568 (1991) ("*IRS*").

The Authority's decision in this case is quite bizarre; it constitutes an unexplained departure from the Authority's prior cases, produces results at odds with the policies of the FSLMRS and defies common sense as well. Under the approach followed in this case, the FLRA never resolves the one issue it concedes to be dispositive—what the language of the contract means. That is, all agree that there can be no unfair labor practice if the contract supports the agency's position; but the FLRA never decides the issue, nor does it allow the matter to be resolved pursuant to the parties' contractual grievance procedures. This result is indefensible. Accordingly, we vacate the Authority's decision in *IRS* and remand for further proceedings consistent with this opinion.

## I. Background

The FSLMRS, as interpreted by the Authority, grants to both agencies and recognized unions the right to designate their own bargaining representatives. *See American Fed'n of Gov't Employees, Local 1738*, 29 F.L.R.A. 178, 188 (1987). It is an unfair labor practice for an agency to interfere with a union's right to designate representatives of its own choosing. *See* 5 U.S.C. § 7116(a)(1), (5) (1988).

At issue in this case is an unfair labor practice charge asserted against the IRS by the National Treasury Employees Union ("NTEU"), which represents certain of the agency's employees. The relationship between the IRS and the NTEU is governed by a collective bargaining agreement known as "NORD II" (hereinafter, "Agreement"). The Agreement contains, *inter alia,* certain rules regarding who can represent bargaining unit employees on behalf of the union in grievance proceedings and other matters. Article 9, section 1 of the Agreement provides, in part, as follows:

A. Unless otherwise expressly stated, wherever in this article the term "steward" is used, it shall include assistant chief stewards, chief stewards, chapter presidents, joint council chairpersons, and any other individuals authorized by the Union in advance to act on its behalf.

B. The union may designate stewards to act on its behalf in accordance with the following:

\*　　\*　　\*　　\*　　\*　　\*

2. all stewards, *except chapter presidents* and chief stewards, must be bargaining unit employees of the appointing office in which they serve....

Agreement at 8 (emphasis added), *reprinted in* Joint Appendix ("J.A.") 1. Disputes arising under Article 9 are subject to the grievance and arbitration provisions contained in the Agreement.

In 1986, Cleveland Harris, the President of NTEU Chapter 198, informed the IRS that he was designating himself "as Steward for ... [a]ll organizational segments within Chapter 198 ... per the provisions of NORD II, Article 9." [1] Harris was an

---

1. Memorandum from Cleveland Harris, President, NTEU Chapter 198, to Al Julg, Chief, Labor Relations Section, IRS, at 1 (Aug. 21, 1986), *reprinted in* J.A. 16.

IRS employee and bargaining unit member at the time he designated himself as a steward. Harris subsequently left the employ of the IRS, but he remained President of Chapter 198.

On October 19, 1987, Harris wrote to the IRS, informing the agency that he "remain[ed] the Steward At Large–EEO of the Los Angeles Joint Council" [2] and demanding access to employee worksites for purposes of carrying on his representational activities.[3] The IRS responded on November 5, 1987, and rejected Harris' request; relying on the fact that Harris was no longer employed by the agency, the IRS refused to recognize him "in any capacity as a steward-at-large" or "as a steward for any organizational segment." [4] The IRS's action was based upon its interpretation of Article 9, section 1(B)(2) of the Agreement, which, in its view, required stewards to be bargaining unit employees. Although the IRS refused to recognize Harris as a steward, it continued to recognize his status as President of Chapter 198 and agreed to permit him limited access to IRS facilities for purposes of discharging his duties in that capacity.

The NTEU took a different view of section 1(B)(2) of Article 9 of the Agreement. It read the phrase "except chapter presidents and chief stewards" as a limiting clause, *exempting* persons in those positions from the general rule that stewards must be bargaining unit employees. Unable to persuade the IRS that its reading of the collective bargaining agreement was correct, the union filed an unfair labor practice charge with the Authority, asserting that the IRS had interfered with its right under the FSLMRS to select its own bargaining representatives.

An Administrative Law Judge ("ALJ") dismissed the unfair labor practice charge in a decision dated December 29, 1988. *See*

*IRS*, 39 F.L.R.A. at 1578 (ALJ Decision). The ALJ reached this result by applying a "differing and arguable interpretations" analysis drawn from the Authority's prior cases. He began by noting that the parties' dispute centered upon the interpretation of Article 9 of the Agreement; thus, in the ALJ's view, the case primarily involved "matters of contractual rights and responsibilities rather than of statutory rights." *Id.* at 1584. The ALJ found that the language of Article 9 gave "at least colorable support to [the] IRS' claim that a chapter president, when acting as a steward in a grievance proceeding, is subject to the unit employee requirement"; he further found that the parties' bargaining history with respect to Article 9, though ambiguous, lent arguable support to the IRS's position. *Id.* at 1585. Based upon these findings, the ALJ held that because both parties had advanced differing and arguably correct interpretations of the Agreement, the appropriate method for resolving the dispute was through the Agreement's grievance and arbitration procedures. *Id.* at 1584. Accordingly, the ALJ dismissed the complaint.

On administrative appeal, the Authority reversed the ALJ's decision. *IRS*, 39 F.L.R.A. at 1573–75. The Authority framed the issue presented as "what approach should apply to address cases that involve an alleged statutory violation and allegations that the parties' collective bargaining agreement permits the action that is alleged to constitute an unfair labor practice." *Id.* at 1573. In answering this question, the Authority first rejected the "differing and arguable interpretations" approach followed by the ALJ, reasoning that the approach

would permit [an agency] to violate protected rights based solely on an "argua-

---

2. Article 9, section 1(B)(9) of the Agreement authorizes the appointment of a "steward-at-large," who may "represent employees in all organizational segments of the chapter ... when there is a need for specific expertise, such as for EEO matters." Agreement at 9, *reprinted in* J.A. 2.

3. Letter from Cleveland Harris, President, NTEU Chapter 198, to Frederick C. Nielsen, Director, IRS, at 1 (Oct. 19, 1987), *reprinted in* J.A. 17.

4. Memorandum from Chief, Labor Relations Section, IRS, to Jay Nelson, Chairperson, NTEU Joint Council, at 1 (Nov. 5, 1987), *reprinted in* J.A. 18.

ble" or "plausible" interpretation of a collective bargaining agreement without any necessity of proving that its interpretation is correct. [In addition], such an approach penalizes aggrieved parties, who are, under section 7116(d) [5] of the Statute, then precluded from filing a grievance.... To the extent that decisions of the Authority have applied this analysis to alleged violations of statutory rights, such decisions will no longer be followed.

*Id.*

The Authority went on to find that the appropriate analysis was whether the NTEU had *clearly and unmistakably waived* its right to designate its own bargaining representatives. Citing its decision in *Marine Corps Logistics Base, Barstow, California,* 39 F.L.R.A. 1126 (1991), *rev'd sub nom. Department of the Navy v. FLRA,* 962 F.2d 48 (D.C.Cir.1992), the Authority held that the dispositive inquiry was not what Article 9 of the contract meant; rather, the dispositive question was whether "the language of the parties' collective bargaining agreement or the bargaining history to the agreement demonstrates that [the NTEU] clearly and unmistakably waived its statutory right." *IRS,* 39 F.L.R.A. at 1574. Adopting the ALJ's findings that both Article 9 and its bargaining history were ambiguous, the Authority held that because the IRS's reading of Article 9 was "not the only plausible interpretation"—that is, *because the Agreement was subject to differing and arguable interpretations*—there had been no "clear and unmistakable waiver" of the NTEU's statutory right to choose its bargaining representatives. *Id.* at 1575 (internal quotations omitted). Accordingly, the Authority held that the IRS had violated the Statute and ordered the agency to recognize Cleveland Harris as a steward-at-large. *Id.* at 1575–76.

The IRS now petitions for review of the FLRA's decision. The Authority has filed a cross-application for enforcement, and the NTEU has intervened on behalf of the Authority.

## II. Analysis

■ A reviewing court will defer to the Authority's interpretation of the FSLMRS if that interpretation is "reasonable and defensible." *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). Application of this standard of review does not mean, however, that judicial review is *pro forma.* Where an Authority decision is found to be " 'incompatible with either the terms or the purpose of the controlling statute,' " it will not withstand a petition for review. *United States Dep't of the Navy v. FLRA,* 952 F.2d 1434, 1439 (D.C.Cir.1992) (quoting *American Fed'n of Gov't Employees, Local 32 v. FLRA,* 853 F.2d 986, 991 (D.C.Cir.1988)).

■ The issue presented for review in this case is narrow. The IRS accepts the Authority's determination that Article 9 of the parties' Agreement does not effect a "clear and unmistakable waiver" of the NTEU's right to designate its own bargaining representatives; thus, the agency agrees that the petition for review must be denied if the FLRA's method of analyzing this case is permissible. The Authority, for its part, concedes that the IRS's interpretation of Article 9 is at least arguably correct; thus, the FLRA agrees that the agency would prevail in an unfair labor practice proceeding under the "differing and arguable interpretations" analysis applied by the ALJ. The only issue, then, is whether the Authority committed legal error in applying a so-called "clear and unmistakable waiver" approach in deciding this case.

---

5. Section 7116(d) of the FSLMRS provides:

Issues which can properly be raised under an appeals procedure may not be raised as unfair labor practices prohibited under this section. Except for matters wherein, under section 7121(e) and (f) of this title, an employee has an option of using the negotiated grievance procedure or an appeals procedure, *issues which can be raised under a grievance procedure may, in the discretion of the aggrieved party, be raised under the grievance procedure or as an unfair labor practice under this section, but not under both procedures.* 5 U.S.C. § 7116(d) (1988) (emphasis added).

The IRS argues that the Authority's "clear and unmistakable waiver" analysis is impermissible because it constitutes an unexplained departure from the Authority's prior cases and because it produces results at odds with the terms and policies of the FSLMRS. We agree, and therefore we vacate the Authority's decision in *IRS* and remand for further proceedings.

A. *Lack of Justification for Authority's Approach in this Case*

■ It is well-established that where an agency departs from its prior cases, it must do so pursuant to reasoned decisionmaking. *See, e.g., Department of the Navy,* 962 F.2d 48, 55; *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). "Divergence from agency precedent demands an explanation," *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C.Cir.1989); where no reasonable explanation is provided, we have no choice but to vacate the decision under review. This case poses a classic example of an unexplained departure from precedent.

In a series of decisions in the mid–1980s, the FLRA developed a "differing and arguable interpretations" analysis for addressing unfair labor practice cases, like *IRS,* in which an agency raises a provision of the applicable collective bargaining agreement as a defense to an alleged unfair labor practice. Under this approach, the Authority asked whether the agency's interpretation of the disputed contractual provision was "arguably" or "plausibly" correct. If the agency could show that its reading of the provision was colorable, the Authority would dismiss the unfair labor practice complaint and refer the parties to arbitration for a definitive interpretation of their contract. *See, e.g., Marine Corps Logistics Base, Barstow, Cal.,* 33 F.L.R.A. 626, 639–42 (1988) ("*Marine Corps Logistics*

*Base*"); *Internal Revenue Serv., Wash., D.C.,* 27 F.L.R.A. 664, 664–68 (1987); *Department of Health & Human Servs., Social Sec. Admin.,* 23 F.L.R.A. 422, 423–24 (1986).

*Marine Corps Logistics Base* is illustrative of the Authority's "differing and arguable interpretations" approach. There, the agency ordered a union steward to discontinue an "official time" grievance investigation when the steward refused to identify the employee on whose behalf he was investigating. The union brought an unfair labor practice charge, asserting that the agency had violated section 7116(a)(1) of the Statute by interfering with the steward's performance of his duties; the agency defended on the ground that its action was consistent with a provision of the collective bargaining agreement which permitted stewards to use official time only for investigation of "specifically identified" complaints. *See* 33 F.L.R.A. at 639–41. The FLRA concluded that the agency's reading of the agreement was at least arguably correct and therefore dismissed the complaint.

> We conclude that the essence of the dispute in this case involves differing and arguable interpretations of the parties' negotiated agreement.... An alleged unfair labor practice which involves differing and arguable interpretations of a collective bargaining agreement is not appropriate for resolution under unfair labor practice procedures. In such cases, the aggrieved party's remedy is through the negotiated grievance procedures of the agreement....

*Id.* at 642 (citation omitted). In so holding, the Authority specifically rejected the position it now embraces—*i.e.,* that a "clear and unmistakable waiver" analysis was appropriate. *See id.*

Numerous other cases are to similar effect.[6] Although the majority of cases in

---

6. *See, e.g., United States Marine Corps, Wash., D.C.,* 33 F.L.R.A. 105, 114 (1988) ("An alleged unfair labor practice which involves differing and arguable interpretations of a collective bargaining agreement is not appropriate for resolution under unfair labor practice procedures."), *overruled by later proceeding,* 42 F.L.R.A. 3

(1991); *Department of the Navy, United States Naval Supply Ctr., San Diego, Cal.,* 31 F.L.R.A. 1088, 1093–94 (1988) ("It is well established that an alleged unfair labor practice which involves different and supportable interpretations of a collective bargaining agreement is not appropriate for resolution under unfair labor practice

which the Authority has applied the "differing and arguable interpretations" analysis were refusal to bargain disputes,[7] the approach also has been applied in cases, such as *Marine Corps Logistics Base*, in which statutory rights other than the duty to bargain were at issue. *See, e.g., 22nd Combat Support Group (SAC), March Air Force Base, Cal.,* 30 F.L.R.A. 331, 334 (1987) (involving union's right to information under section 7114(b)(4) of FSLMRS); *Harry S. Truman Memorial Veterans Hosp., Columbia, Mo.,* 11 F.L.R.A. 516, 519 (1983) (involving grievance rights under section 7121 of Statute). Indeed, in one such case, the Authority summarily affirmed a decision in which the ALJ applied the "differing and arguable interpretations" approach on facts indistinguishable from those of the case at bar. *See Department of Health & Human Servs., Social Sec. Admin., Baltimore, Md.,* 22 F.L.R.A. 91, 91–92, 113–14 (1986) (upholding ALJ's application of "differing and arguable interpretations" approach where agency refused to recognize individual designated as representative by union).

■ The "differing and arguable interpretations" approach was eminently sensible because it properly took account of the "strong Congressional policy favoring arbitration" in public sector labor relations. *Overseas Educ. Ass'n v. FLRA,* 824 F.2d 61, 63 (D.C.Cir.1987). Under the FSLMRS, it is the arbitrator, and not the FLRA, who is the principal interpreter of collective bargaining agreements. *See Karahalios v. Defense Language Inst.,* 821 F.2d 1389, 1392 (9th Cir.1987) ("Congress showed a strong preference for keeping the interpretation and enforcement of collective bar-

gaining agreements within the process of arbitration...."), *aff'd sub nom. Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989). In cases like the one at bar, in which an agency raises a provision of the collective bargaining agreement as a defense to an unfair labor practice charge, the issue upon which the alleged unfair labor practice rises or falls is *the meaning of the language of the agreement.* If the agency's interpretation is correct, then there has been no unfair labor practice because the agreement authorized the disputed agency action. In applying the "differing and arguable interpretations" approach, the Authority properly recognized that, where a case turns on the meaning of the collective bargaining agreement, a definitive construction of the agreement should be obtained from the arbitrator—the tribunal primarily responsible for discharging that task under the FSLMRS.

In the case at bar, the Authority departed from its "differing and arguable interpretations" method of analysis. In its place, the Authority adopted a test which looks only to determine whether the disputed contractual language embodies a "clear and unmistakable waiver" of the statutory right at issue. If the disputed language is in any manner unclear or ambiguous, then the unfair labor practice claim will be upheld. *See IRS,* 39 F.L.R.A. at 1573–75. In other words, under its new "clear and unmistakable waiver" test, the FLRA does not interpret the collective bargaining agreement to decide whether the agency's defense is valid, nor does it refer the case to arbitration for a definitive con-

procedures."); *22nd Combat Support Group (SAC), March Air Force Base, Cal.,* 30 F.L.R.A. 331, 334 (1987) (same); *Internal Revenue Serv., Wash., D.C.,* 27 F.L.R.A. 664, 667–68 (1987) (same); *Harry S. Truman Memorial Veterans Hosp., Columbia, Mo.,* 11 F.L.R.A. 516, 519 (1983) (collecting cases).

7. Intervenor NTEU contends that the Authority has limited its application of the "differing and arguable interpretations" approach to cases involving *contractual* rights—specifically, cases in which a refusal to bargain is alleged on the ground that the agency has "repudiated" the

collective bargaining agreement by committing a major breach. *See* Brief for the Intervenor at 29–32. It is probably accurate to say that the approach had its genesis in "repudiation" cases. *See, e.g., Division of Military & Naval Affairs, State of N.Y., Albany, N.Y.,* 8 F.L.R.A. 307, 322 (1980) (ALJ Decision) (citing cases). However, as the cases cited in the text demonstrate, the NTEU is simply wrong when it asserts that the Authority has limited the applicability of the "differing and arguable interpretations" approach to cases involving so-called "contractual" rights.

struction of the agreement; rather, the Authority simply decides whether the contractual language is less than crystal clear, and, if it is, then the union prevails on the ground that there has been no "clear and unmistakable waiver" of the underlying statutory right.

In effect, then, the Authority's newly-adopted "clear and unmistakable waiver" analysis turns the "differing and arguable interpretations" approach on its head—under the new rule, if the collective bargaining agreement is subject to differing and arguable constructions, then it is the union, not the agency, which prevails before the Authority, *regardless of what the true meaning of the agreement is.* Thus, in *IRS,* the Authority held that the agency had committed an unfair labor practice *precisely because* Article 9 of the Agreement was susceptible to differing and arguable interpretations. *See id.* at 1575; *see also Department of Veterans Affairs, Veterans Admin.Medical Ctr., Boise, Idaho,* 40 F.L.R.A. 992, 997 (1991) ("We agree with the [ALJ] that either interpretation of the provision is plausible. As such, . . . we conclude that the provision does not constitute a clear and unmistakable waiver of the Union's right. . . ."). This makes no sense.

In its decision in *IRS,* and in its brief to this court, the Authority advanced two justifications in support of its abandonment of the "differing and arguable interpretations" approach in favor of its new "clear and unmistakable waiver" analysis. Neither of these justifications withstands scrutiny.

The Authority first contends that if it analyzed cases such as the one at bar as disputes over contract interpretation—instead of applying its "clear and unmistakable waiver" analysis—then an agency could "violate protected rights based solely on an 'arguable' or 'plausible' interpretation of a collective bargaining agreement without any necessity of proving that its

interpretation is correct." *IRS,* 39 F.L.R.A. at 1573. This contention is utterly specious, because it is simply not true that the "differing and arguable interpretations" approach permits an agency to prevail against a union without proving the correctness of its reading of the contract.

Under the "differing and arguable interpretations" analysis, when an agency defends against an unfair labor practice charge on the basis of a contractual provision—and the agency's reading of the provision is at least arguably correct—then the dispute goes to arbitration.[8] There, the agency must prove to the arbitrator that its interpretation of the contract is, in fact, correct. If the agency succeeds in this endeavor, the arbitrator will hold for the agency and deny relief to the union, which would likewise be the proper result in an unfair labor practice proceeding. On the other hand, if the agency fails to sustain its burden of proof, the arbitrator will hold for the union and order appropriate relief. In most, if not all, cases, the relief granted by the arbitrator will be the same as that which the Authority would grant upon finding an unfair labor practice. For example, in the case at bar, the relief that an arbitrator would have given upon rejecting the IRS's position with respect to Article 9 presumably would have been an award requiring the agency to recognize Mr. Harris as a steward—precisely the same relief ordered by the FLRA. Thus, it is simply nonsensical to maintain, as the Authority does, that the "differing and arguable interpretations" analysis permits an agency to violate employee rights on the basis of an unproven interpretation of the contract.

The Authority's second proposed justification for abandoning the "differing and arguable interpretations" approach is that the approach unfairly "penalizes aggrieved parties, who are, under section 7116(d) of the Statute, then precluded from filing a grievance." *IRS,* 39 F.L.R.A. at 1573.

---

**8.** The FLRA contends that it would be authorized to hear cases like the one at bar, even if it analyzed them as contractual disputes, because 5 U.S.C. § 7116(d) permits it to interpret collective bargaining agreements where necessary to resolve an unfair labor practice claim. Thus, it

may be that cases like *IRS* could be tried to the Authority, instead of the arbitrator, under the "differing and arguable interpretations" approach. As discussed in section II.B, *infra,* we express no view on this question.

The gist of this contention is that if a union brings an unfair labor practice charge before the Authority, and the Authority decides to dismiss the complaint in favor of arbitration, then the union would be precluded by section 7116(d) from actually proceeding to arbitration. *See id.*

We find the Authority's second justification to be as unpersuasive as the first. Section 7116(d) of the FSLMRS provides, in part, that "issues which can be raised under a grievance procedure may, in the discretion of the aggrieved party, be raised under the grievance procedure or as an unfair labor practice ... *but not under both procedures.*" 5 U.S.C. § 7116(d) (1988) (emphasis added). The purpose of the section is to permit an aggrieved party to choose between the arbitrator and the Authority in appropriate cases, but to prevent the party from having two bites at the adjudicatory apple by "relitigat[ing] ... the same issue in a different forum." *United States Dep't of the Army, United States Marine Corps Logistics Base, Albany, Ga.,* 37 F.L.R.A. 1268, 1274 (1990) ("*Department of the Army*"); *see also Ameri-*

can Fed'n of Gov't Employees, Local 1411 v. FLRA, 960 F.2d 176, 178 (D.C.Cir.1992) ("*Local 1411*"); [9] *Overseas Educ. Ass'n,* 824 F.2d at 63–64. The "differing and arguable interpretations" approach is entirely consistent with this purpose, because, under that approach, the substance of an aggrieved party's claim is litigated *in only one forum.* Thus, it is simply incorrect to maintain, as the Authority does, that the approach violates section 7116(d)'s proscription against duplicative proceedings.[10] Indeed, we find it most surprising that the Authority even advances this contention, given that it has followed the "differing and arguable interpretations" approach in numerous cases without expressing a whit of concern over possible conflict with section 7116(d).

Far from supporting the Authority's decision to abandon the "differing and arguable interpretations" approach, section 7116(d) actually undermines that decision, for the Authority's new "clear and unmistakable waiver" analysis contravenes the policies underlying that provision. As not-

**9.** We recognize that, in *Local 1411,* this court upheld the Authority's conclusion that an employee's grievance was barred by an earlier-filed unfair labor practice charge, despite the fact that the charge had been dismissed on procedural grounds without a full hearing on the merits. *See id.,* 960 F.2d 176, 177. However, there is no inconsistency between *Local 1411* and our holding today. There, the court did not in any way confront the question we now face—whether section 7116(d) precludes a later-filed grievance where a party's unfair labor practice claim is dismissed *pursuant to a deferral policy adopted by the Authority.* Rather, the question before the court was simply whether an employee who had opted to proceed in one forum, with unfavorable results, could later initiate proceedings in a second forum; the court reached the unstartling conclusion that section 7116(d) prevented this result.

The decision in *Local 1411* expressly embraces the concept we find dispositive here—*i.e.,* that the purpose of section 7116(d) is to permit an aggrieved party one opportunity to litigate the merits of his complaint in a forum where relief is available, but only one such opportunity. *Id.* at 178; *see also id.* at 179 (finding that although employee's grievance was barred by section 7116(d), employee could petition General Counsel to reconsider apparently erroneous decision not to prosecute unfair labor practice charge). Thus, there is nothing in *Local 1411*

which supports the Authority's contention in this case that section 7116(d) prevents it from adhering to the "differing and arguable interpretations" approach—a contention made all the more extraordinary by the fact that the Authority has dismissed unfair labor practice complaints pursuant to that approach in numerous cases in the past without dropping any hint that the later-filed grievance might constitute a "second bite at the apple" under section 7116(d), or that an agency-employer might properly refuse to process the grievance on that ground.

**10.** The Authority also argues that the "differing and arguable interpretations" approach is inconsistent with the interpretative gloss it has read onto section 7116(d). We find no merit in this contention. The Authority has interpreted section 7116(d) to preclude a subsequently-filed grievance only if the grievance raises the "same issue" that was raised in a previous unfair labor practice proceeding. *See Department of the Army,* 37 F.L.R.A. at 1272. Under the "differing and arguable interpretations" approach, the issues raised in the unfair labor practice claim and the subsequent grievance will *not* be "the same," because the issue in the unfair labor practice proceeding will be whether the parties' agreement is reasonably susceptible to differing interpretations, while the issue in the grievance proceeding will be what the language of the agreement means.

ed above, section 7116(d) permits an aggrieved union or employee whose complaint is capable of being characterized as either a contractual violation or a statutory violation to elect whether to bring the claim as a grievance or an unfair labor practice charge. *See id.* at 64 ("Congress ... left the route selection to the discretion of the aggrieved party, while at the same time mandating that selection of one route precluded use of the other."). By providing for a *choice* of forum, section 7116(d) assumes that a similar analytical approach would be followed—if not the same result reached—by both the arbitrator and the Authority with respect to matters over which there is concurrent jurisdiction. *See id.* at 66; *cf. Cornelius v. Nutt*, 472 U.S. 648, 660–62, 105 S.Ct. 2882, 2889–90, 86 L.Ed.2d 515 (1985) (finding that Congress intended arbitrators and the Merit Systems Protection Board to apply same standards in reviewing agency disciplinary actions).

Under the approach adopted by the Authority in *IRS*, however, the results reached in the two fora in cases like the one at bar will be markedly different: an arbitrator would construe the contractual language to determine which party's interpretation of the contract is correct, while the Authority would look only to see if the contractual provision upon which the agency relies is in any way ambiguous and, if such is the case, sustain the unfair labor practice charge. Thus, under the new "clear and unmistakable waiver" regime, section 7116(d)'s promise of a *choice* of forum is illusory because there is no reason for a union ever to choose arbitration, where it will have to litigate the meaning of the contract, instead of proceeding before the Authority, where to prevail it need only show that the contractual language is other than crystal clear. Such a result flies in the face of Congress's intent in

enacting section 7116(d). Nor can the Authority's result be squared with the FSLMRS's strong policy in favor of private dispute resolution. *See Overseas Educ. Ass'n*, 824 F.2d at 63, 66.

In short, of the two justifications offered by the Authority for its abandonment of the "differing and arguable interpretations" approach, the first is unfounded and the second actually supports the opposite result. It follows that the Authority has failed to advance any appropriate justification for its change in approach, and that remand is required.

### B. Policies of the FSLMRS

In addition to constituting an unexplained departure from its prior analytical method, the "clear and unmistakable waiver" approach adopted by the Authority in this case is internally inconsistent and produces results at odds with the policies of the FSLMRS. That circumstance provides a second ground upon which the Authority's decision in *IRS* must be vacated.

■ As a preliminary matter, we note that the Authority takes the position that, under section 7116(d) of the Statute, it is empowered to hear cases like the one at bar notwithstanding the fact that such cases turn upon an interpretation of the underlying collective bargaining agreement. That the Authority has this power is not self-evident because, as noted above, it is the arbitrator who is the principal interpreter of collective bargaining agreements under the FSLMRS. Nonetheless, for purposes resolving this case, we assume without deciding that it is within the Authority's competence to interpret a collective bargaining agreement where necessary to resolve an unfair labor practice claim.[11] *Cf. NLRB v. C & C Plywood*

11. Intervenor NTEU goes much further, suggesting that the FSLMRS not only *permits* the Authority to interpret collective bargaining agreements, but actually *requires* the Authority to do so where a party chooses to come to the Authority with a claim that could also be raised under a grievance procedure. For this reason, the NTEU argues, section 7116(d) affirmatively prevents the Authority from following a policy of deferring to arbitration like that adopted by the

National Labor Relations Board in *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). *See Hammontree v. NLRB*, 925 F.2d 1486, 1490–91 (D.C.Cir.1991) (en banc) (explaining *Collyer* doctrine).

We find no merit in the NTEU's contention. Even if section 7116(d) permits the Authority to hear unfair labor practice claims that turn upon questions of contract interpretation, it surely

*Corp.*, 385 U.S. 421, 428, 87 S.Ct. 559, 564, 17 L.Ed.2d 486 (1967).

Assuming that the Authority has the discretion to hear cases like the one at bar, we conclude that it abused that discretion in *IRS* by reaching a result that is illogical on its own terms. The Authority acknowledged in *IRS*, and again at oral argument, that the statutory right at issue in this case—the union's right to choose its own bargaining representatives—is a right that may be altered or surrendered through collective bargaining. *See IRS*, 39 F.L.R.A. at 1574–75. In other words, the Authority agrees with the IRS that where a collective bargaining agreement limits who may serve as a union representative, the union must abide by those limitations. The Authority further concedes that if the IRS's interpretation of the negotiated agreement in this case is correct—that is, if Article 9 of the Agreement means that Mr. Harris in ineligible to serve as a steward—then the Agreement governs and the IRS is entitled to prevail.

Despite these concessions, the Authority adopted an approach in this case which fails to address the dispositive issue—*what the Agreement means*. Instead, under its "clear and unmistakable waiver" approach, the Authority simply looks for an ambiguity in the contractual language. And if there is such an ambiguity—as surely there almost always is in any written contract— then the union prevails because it is deemed not to have "clearly and unmistakably waived" its statutory right. This approach is illogical on two fronts: it first transforms a dispute over contract interpretation into an unfair labor practice case, and then resolves the case without ever answering the interpretative question that spawned the dispute in the first place.

The Authority's approach defies not only logic but also the FSLMRS, because it produces results that cannot be squared with the policies of the Statute. Congress's intent in enacting the FSLMRS was to establish a collective bargaining regime in which agencies and unions would reach binding and stable collective bargaining agreements. *See Department of the Navy v. FLRA*, 962 F.2d 48, 59 (D.C.Cir.1992).[12] The so-called "clear and unmistakable waiver" approach adopted in *IRS* undermines the collective bargaining regime established by Congress by effectively relieving one party of its contractual obligations. Under the Authority's approach, the provisions of a collective bargaining agreement will be enforced—at least insofar as matters implicating statutory rights are concerned—only if they are crystal clear, reflect no facial ambiguities and precisely cover the matter at issue. *See IRS*, 39 F.L.R.A. at 1574–75. Since this will rarely be the case, given the frailty of human drafters and the complexity of most public sector collective bargaining agreements, the result often will be to prevent the agency from enforcing the restrictions on union "rights" for which it has bargained, and to which the union has agreed. Thus, in many cases, the provisions of the parties' agreement will be rendered a nullity, in direct contravention of the FSLMRS's policies of contractual stability and repose.

The Authority attempts to defend its "clear and unmistakable waiver" approach on the ground that the approach is somehow necessary to adequately protect "employee rights," *see id.* at 1573; but this view is unfounded and, even from the union's perspective, exceedingly myopic. Stable and enforceable collective bargaining agreements protect the interests of the agency and bargaining unit employees

does not require that result, nor does it forbid the Authority from referring the parties to arbitration for a definitive interpretation of their agreement. The NTEU's argument to the contrary is patently inconsistent with the FSLMRS's strong policy in favor of arbitration and private dispute resolution. *See Overseas Educ. Ass'n*, 824 F.2d at 63, 66.

**12.** As the Authority itself has explained, "[T]o the extent that the parties are required to adhere

to the specific conditions of employment mutually established in their agreement during the life of such agreement, stability at the work place is thereby fostered." *Internal Revenue Serv.*, 17 F.L.R.A. 731, 734 (1985), *petition for review granted sub. nom. National Treasury Employees Union v. FLRA*, 810 F.2d 295 (D.C.Cir. 1987).

alike. Indeed, such agreements provide a far more effective bulwark for protecting employees' interests than do the relatively abstract statutory entitlements reified by the Authority in *IRS*. By applying its "clear and unmistakable waiver" approach out of purported concern for the preservation of "statutory rights"—and thereby undermining the stability of the very collective bargaining process those rights exist to nourish—the Authority guards the building blocks of collective bargaining at the expense of the edifice itself. This result is in the long-term interest of neither party.

As unfortunate as the results produced by the Authority's "clear and unmistakable waiver" approach are in this case, they are dwarfed by the consequences that will follow if the Authority extends the approach to refusal to bargain cases in which a contract provision is raised as a defense. In *IRS*, there is, at least arguably, a statutory right to be vindicated apart from the terms of the negotiated agreement.[13] In the refusal to bargain context, however, the resolution of the unfair labor practice claim is *entirely* a matter of contract interpretation, because whether there is a duty to bargain depends solely upon what the contract means. Under the Authority's "clear and unmistakable waiver" approach, the union would almost invariably prevail in duty to bargain cases, because it almost always could find some ambiguity in the relevant contractual language. The result would be an endless duty to bargain on the part of the agency, with a resultant evisceration of the FSLMRS's policies of contractual stability and repose.

Intervenor NTEU suggested at oral argument that the Authority may not have intended that *IRS*'s framework be applied in the refusal to bargain context. We agree that the Authority might have been able to draw a reasoned distinction between the duty to bargain and other statutory rights. *Cf. Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d

1027, 1033 (D.C.Cir.1986) ("Examination of the leading cases reveals that the explicitness with which a waiver must be stated in a contract varies with the nature of the right at issue."). But if the Authority meant to draw such a distinction, it has not done so in *IRS*, which contains no indication that the applicability of the "clear and unmistakable waiver" approach is limited to cases involving statutory rights other than the duty to bargain. Indeed, our review of the Authority's post-*IRS* cases gives no reason for optimism that the Authority has limited the spread of its flawed approach. *See, e.g., United States Dep't of the Navy, Marine Corps Logistics Base, Barstow, Cal.*, 42 F.L.R.A. 287, 297 (1991) ("[F]or the reasons stated in [*IRS*, we hold that] when a union asserts a statutory right to bargain on the impact and implementation of a management decision, we will not dismiss the case on the ground that the matter involves differing and arguable interpretations of the negotiated agreement."); *Department of the Army, United States Army Enlisted Records & Evaluation Ctr., Fort Benjamin Harrison, Ind.*, 41 F.L.R.A. 885, 896–99 (1991) (applying "clear and unmistakable waiver" test where agency raised contractual provision as defense to existence of bargaining obligation). That the Authority appears willing to extend its "clear and unmistakable waiver" methodology to refusal to bargain cases provides further evidence of the ill-conceived nature of that approach.

## C. *The Case in Issue*

In *IRS*, the Authority found that the agency had committed an unfair labor practice based upon an application of its "clear and unmistakable waiver" approach. For the reasons explained above, we hold that the Authority committed legal error on several grounds: the Authority has failed to provide any reasoned justification for its departure from its prior "differing and arguable interpretations" approach; the

---

**13.** *But see, e.g., Plumbers & Pipefitters Local Union No. 520 v. NLRB*, 955 F.2d 744, 754 (D.C.Cir.1992) (holding that where bargainable subject that would otherwise constitute statutory right under National Labor Relations Act is

incorporated into collective bargaining agreement, subject to grievance and arbitration provision, contract supplants statute as source of parties' rights); *American Freight Sys., Inc. v. NLRB*, 722 F.2d 828, 832 (D.C.Cir.1983) (same).

"clear and unmistakable waiver" analysis is illogical and internally inconsistent; and the results that flow from the new test contravene the policies of the FSLMRS. Because *IRS* was decided under this flawed and impermissible approach, we must vacate the Authority's decision and remand for reconsideration.

On remand, the Authority should decide whether to return to the "differing and arguable interpretations" methodology or to adopt some other approach that is consistent with the FSLMRS and this opinion. The Intervenor suggests that the Authority may not have intended that the "clear and unmistakable waiver" analysis applied here should extend to duty to bargain disputes. Subsequent cases suggest that the Authority has not adhered to the limitation suggested by the NTEU; furthermore, even with such a limitation, it is far from clear that the approach adopted here will survive scrutiny in *any* case of this sort. In any event, we leave it to the FLRA in the first instance to consider whether the duty to bargain context is distinguishable from the circumstances of this case and, if so, what analysis should apply in such cases.

### III. CONCLUSION

This case is, in certain respects, similar to *Department of the Navy v. FLRA*, 962 F.2d 48 (D.C.Cir.1992). Here, as in the decisions under review in that case, the Authority has rushed headlong into the embrace of a convoluted "clear and unmistakable waiver" analysis without adequately considering whether that analysis is appropriate in the circumstances before it. In this case, the Authority's reflexive embrace led it to adopt an approach under which the question that the Authority recognizes to be dispositive—what the language of Article 9 of the collective bargaining agreement means—is left unanswered. That result makes no sense, and it subverts the collective bargaining structure that the Authority is charged with upholding. Accordingly, we grant the IRS's petition for review and deny the Authority's cross-application for enforcement. The Authority's decision in *IRS* is vacated and the case

remanded for further proceedings consistent with this opinion.

SO ORDERED.